IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

CARRIE RUBERTI,

                    Plaintiff,

        v.

COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 16-8977 (JBS)

**OPINION**

APPEARANCES:

Lauren S. Tovinsky, Esq.
JACOBS SCHWALBE & PETRUZELLI PC
10 Melrose Avenue
Suite 340
Cherry Hill, NJ 08003
     Attorney for Plaintiff

Evelyn Rose Marie Protano
Special Assistant U.S. Attorney
SOCIAL SECURITY ADMINISTRATION
Office of the General Counsel
P.O. Box 41777
Philadelphia, PA 19101
     Attorney for Defendant

**SIMANDLE, District Judge:**

## I.    INTRODUCTION

This matter comes before this Court pursuant to 42 U.S.C. §
405(g) for review of the final decision of the Commissioner of
the Social Security Administration ("SSA") denying Plaintiff
Carrie Ruberti's ("Plaintiff") application for disability

benefits under Title XVI of the Social Security Act, 42 U.S.C. §
401, et seq. Plaintiff, who allegedly suffers from major
depressive disorder, an anxiety related disorder, irritable
bowel syndrome, headaches, and hypertension, was denied benefits
for the period beginning on September 1, 2009, the alleged onset
date of disability, to July 29, 2016, the date on which the
Administrative Law Judge ("ALJ") issued a written decision.

In the pending appeal, Plaintiff argues that the ALJ's
decision must be reversed and remanded on three grounds. To that
end, Plaintiff contends that the ALJ erred by: (1) failing to
properly weigh the medical evidence of record or explain medical
evidence she dismissed, including the opinion of Plaintiff's
treating physician, Dr. Kaczaj; (2) failing to take into account
all of Plaintiff's medically determinable impairments; and (3)
improperly discounting Plaintiff's testimony. For the reasons
stated below, the Court will vacate the decision of the ALJ and
remand for further proceedings consistent with this Opinion.

## II.  BACKGROUND

### A.  Procedural History

Plaintiff filed her application for Social Security
disability benefits on February 23, 2013, alleging an onset date
of September 1, 2009. (R. at 23.) Plaintiff's claim was denied
by the Social Security Administration on July 3, 2013. (R. at
20.) Her claim was again denied upon reconsideration on April 3,

2014. (R. at 20.) Plaintiff next testified in person before ALJ Marguerite Toland on November 17, 2015. (R. at 20.) ALJ Toland issued an opinion on July 29, 2016, denying Plaintiff benefits. (R. at 32.) On November 9, 2016, the Appeals Council denied Plaintiff's request for review. (R. at 1.) This appeal timely follows.

**B.  Medical History**

The following are facts relevant to the present motion. Plaintiff was 55 years old as of the date of the ALJ Decision. (R. at 226.) Plaintiff graduated from high school and earned 72 college credits. (R. at 30, 47.) She received her certification to become a nurse's aide and worked as a nurse's aide until 2002. (R. at 49–50.) Plaintiff last worked as the Assistant Director of a daycare until September 27, 2009, when she was let go following a disagreement with the daycare's owner. (R. at 50, 229.) Plaintiff currently lives in her daughter's home with her husband, daughter, son-in-law, and four grandchildren. (R. at 75–76.)

1.  <u>Medical Treatment Prior to Alleged Disability</u>

On April 27, 2003, Plaintiff voluntarily admitted herself into Hampton Behavioral Health Center after reportedly feeling overwhelmed by depression, insomnia, and suicidal ideation. (R. at 289.) Once she was admitted, Plaintiff was diagnosed with and treated for major depressive disorder and irritable bowel

syndrome, and assigned a Global Assessment of Functioning ("GAF")[1] score of 20. (R. at 291-92.) By April 30, 2003, Plaintiff was no longer having suicidal ideation and was otherwise in an improved condition. (R. at 291.) When Plaintiff was discharged on May 1, 2003 she was assigned a GAF of 50. (R. at 291-92.)

On July 15, 2009, Plaintiff was treated at South Jersey Healthcare for abdominal pain. (R. at 355.) An abdominal CT revealed a small cyst in Plaintiff's kidney and small fibroids in her uterus, but no acute inflammatory processes were seen involving her bowel and there was no evidence of free intraperitoneal air or fluid. (R. at 369-70.) On August 10, 2009, Plaintiff met with Dr. Malogorzata Connelly, again complaining of abdominal pain. (R. at 593.) Dr. Connelly performed an EKG on Plaintiff at this time. (R. at 593.)

On August 26, 2009, Dr. Jonathan Gewirtz treated Plaintiff for abdominal and pelvic pain, observing that she had a tender abdomen and enlarged right ovary. (R. at 383.) Dr. Gewirtz recommended that Plaintiff undergo a total abdominal hysterectomy and bilateral salpingo-oophorectomy. (R. at 383.)

---

[1] GAF is a numeric scale used by mental health professionals to rate the social, occupational, and psychological functioning of a patient. Scores range from 1 (severely impaired) to 100 (extremely high functioning).

2.  <u>Impairments During Period of Alleged Disability</u>[2]

On September 2, 2009, Plaintiff underwent a total abdominal hysterectomy at South Jersey Healthcare. (R. at 381.) Treatment notes at this time indicated Plaintiff had a history of irritable bowel syndrome. (R. at 384, 387.)

Between September 16, 2009 and December 7, 2011, Plaintiff met with Dr. Connolly several times regarding continued abdominal pain. (R. at 578-82, 593.) Notably, on October 6, 2009, Plaintiff reported that her irritable bowel syndrome is "severe – never goes away" and that she had "constipation/ diarrhea on fiber." (R. at 582.) On December 10, 2010, Plaintiff told Dr. Connolly she "can't find [a] job" and that, with regard to the irritable bowel syndrome she "feels like [she is] ready to pop!" (R. at 581.) On June 9, 2011, Plaintiff reported that her irritable bowel syndrome had gotten worse. (R. at 579.) Each time she met with Dr. Connolly, Plaintiff also reported depression and anxiety. (R. at 578-82.)

On May 9, 2012, Plaintiff went to the emergency room with an "altered mental status." (R. at 495.) Plaintiff's daughter explained to the treating physician that, when Plaintiff had called in the morning, she seemed confused and her speech "wasn't right." (R. at 495.) Plaintiff was diagnosed with

---

[2] Plaintiff alleges her period of disability began on September 1, 2009. (R. at 212.)

psychosis and eventually transferred from the hospital to
Bridgeton Crisis for a psychiatric consult. (R. at 506-07.)

On May 12, 2012, Plaintiff returned to the hospital due to
anxiety. (R. at 404.) Her examination showed she had an "anxiety
reaction" and urinary tract infection. (R. at 404.) The treating
physician noted that Plaintiff's symptoms had "markedly improved
after treatment." (R. at 506.) When offered the opportunity to
transfer to Bridgeton Crisis for a psychological evaluation,
Plaintiff said she was feeling better and wanted to go home. (R.
at 406.)

Unfortunately, on May 19, 2012, Plaintiff had a third
psychiatric emergency and was again hospitalized at South Jersey
Healthcare for "severe anxiety." (R. at 401.) Dr. Cathy Larrain
observed that Plaintiff "presents with episode of acute
psychosis as well as continued generalized anxiety disorder,"
and recommended that Plaintiff follow up for a psychiatry
evaluation. (R. at 402-03.) The following day, Plaintiff
consulted with Dr. Rajalla Prewitt, who upon evaluation,
prescribed Plaintiff with Klonopin and recommended that she
follow-up with the Brigeton IOP program and social services. (R.
at 461-62.)

On June 19, 2012, Plaintiff started treatments at the South
Jersey Healthcare Behavior Wellness Center. (R. at 436.) At the
initial consult, Plaintiff reported: "I am severely depressed. I

don't like to leave the house anymore. I have anxiety of all social events & just want to hide. I am sad all the time, cry often, & am upset of my employment status." (R. at 451.) Plaintiff then attended six therapy sessions and two medication sessions between June 26, 2012 and December 29, 2012 (R. at 437-450.) On December 29, 2012, Plaintiff was discharged from further tratments due to noncompliance. (R. at 436.)

### 3.   Primary Care Physician Treatment

Since at least June 5, 2012, Plaintiff treated with her primary care physician, Dr. Olga Kaczaj. (R. at 419.) On January 25, 2013, Plaintiff met with Dr. Kaczaj and requested a letter to "confirm that [Plaintiff] is unable to work." (R. at 417.) At this time, Dr. Kaczaj noted that Plaintiff "is very depressed" and "sometimes does [sic] wanna leave the house, also has headaches in the back of head for a while now." (R. at 417.) On December 17, 2013, Dr. Kaczaj diagnosed Plaintiff as having "depression with anxiety." (R. at 565.)

On December 18, 2013, Dr. Kaczaj completed a check-list "Mental Assessment Form" on Plaintiff's behalf. (R. at 517-21.) Under the "Making Occupational Adjustments" section of the form, Dr. Kaczaj checked "Poor/None" in all of the spaces representing Plaintiff's ability to adjust to a job. (R. at 517-18.) Dr. Kaczaj further observed that Plaintiff is "unable to work in any work environment, fulfill any tasks . . . due to ongoing

anxiety/depression; [and] has panic attacks, difficulty concentrating, forgetful, 'moody.'" (R. at 518.) Under the "Making Performance Adjustments" portion of the form, Dr. Kaczaj checked "Poor/Fair" for complex job instructions and detailed, but not complex job instructions and "Good" for simple job instructions. (R. at 518.) In the "Making Personal-Social Adjustments" section, Dr. Kaczaj checked "Good" for Plaintiff's ability to maintain her personal appearance, "Fair" for her ability to behave in an emotionally stable manner and understand simple job instructions, and "Poor/None" for Plaintiff's ability to demonstrate reliability. (R. at 519.) Dr. Kaczaj also observed that Plaintiff has "difficulty getting along [with] coworkers due to irritability." (R. at 519.) Dr. Kaczaj rated the impairments and limitations Plaintiff experienced as "Moderately Severe," except he rated Plaintiff's estimated degree of deterioration in personal habits as "Moderate" and Plaintiff's ability to perform competitive tasks as "severe." (R. at 520-21.) Finally, Dr. Kaczaj opined that Plaintiff was "unable to maintain employment." (R. at 521.)

On October 2, 2014, Dr. Kaczaj met with Plaintiff and, again, diagnosed her with "depression with anxiety." (R. at 564.) During a routine check up on June 5, 2015, Dr. Kaczaj diagnosed Plaintiff with "major depressive disorder, severe" and "anxiety disorder, generalized." (R. at 563.) On September 22,

2015, Dr. Kaczaj treated Plaintiff for severe abdominal pain, bowel blockage, loose bowels, and vomiting. (R. at 562.)

On October 1, 2015, Dr. Kaczaj completed an examination report in which she diagnosed Plaintiff with major depression, anxiety, and bowel obstruction. (R. at 560.) According to Dr. Kaczaj, Plaintiff was "unable to maintain focus for long period of time, poor memory, very forgetful." (R. at 560.) Dr. Kaczaj further determined that Plaintiff was unable to engage in any gainful employment or occupational training of any kind and opined that Plaintiff was "permanently disabled." (R. at 560.)

Dr. Kaczaj completed an undated "Social Security Disability Psychiatric Report," wherein she referenced Plaintiff's history of severe depression and a suicide attempt in 2005. (R. at 423.) In this report, Dr. Kaczaj noted that she found Plaintiff to be "credible." (R. at 423.)

### 4. State Agency Consultants

On June 26, 2013, Plaintiff was examined by agency psychologist, Dr. Theodore Brown. (R. at 429.) Dr. Brown tested Plaintiff's memory and noted that she could "remember three of three items immediately and one of three after five minutes." (R. at 431.) Dr. Brown noted her thought processes to be "coherent and goal directed" with "no evidence of illusions, delusions, hallucinations, or paranoia in the evaluation setting." (R. at 431.) However, Dr. Brown listed Plaintiff's

functioning as "below average" and noted that the results of the evaluation were consistent with Plaintiff's allegations. (R. at 431.) Ultimately, Dr. Brown diagnosed Plaintiff with depression and anxiety, and assigned her a GAF of 50 to 55. (R. at 432.)

On March 19, 2014, Dr. Christopher Williamson, a second agency psychologist, completed a mental status examination. (R. at 522.) Dr. Williamson noted that Plaintiff was noticeably depressed, withdrawn, and guarded. (R. at 523.) Dr. Williamson also noted that Plaintiff's "fund of knowledge appeared to be in average range" and she could recall "1 out of 3 common objects at 5- and 1-minute intervals." (R. at 523.) Dr. Williamson diagnosed Plaintiff with major depressive disorder, anxiety disorder, and hypertension. (R. at 523.) Dr. Williamson also noted that Plaintiff's overall level of anxiety and depression persisted despite her compliance with medications. (R. at 523.)

On July 2, 2013, Dr. Monica Lintott, a state agency medical consultant, reviewed Plaintiff's medical records and assessed her mental residual functional capacity. (Id. at 99–101.) Dr. Lintott indicated that Plaintiff could follow simple instructions, sustain pace, persistence, concentration, and attention, and relate and adapt to work-like situations. (R. at 101.)

On April 2, 2014, Dr. Ryan Mendoza, another state agency medical consultant, reviewed Plaintiff's medical records and

made similar findings to those in Dr. Lintott's report. (R. at
136.)

### 5. Plaintiff's Activities

At a hearing held before the ALJ on November 17, 2015,
Plaintiff testified that, because of memory issues, her husband
administers her medicine and that sometimes she tries to take
her medicine again because she forgets she has already taken it.
(R. at 59.) Plaintiff also testified that she has difficulty
maintaining attention and concentration, resulting in an
inability to manage money, read, and watch television. (R. at
59, 64-65.) Plaintiff explained that she has trouble socializing
and avoids leaving her home. (R. at 62, 76.) Plaintiff also
discussed her struggles with suicidal thoughts (R. at 73-74),
and testified that she sometimes sees shadows that are not
there. (R. at 52.) In addition to her psychological issues,
Plaintiff testified that she suffers from irritable bowel
syndrome which, during flare ups, causes her to have to use the
bathroom up to three times per hour. (R. at 69.)

### 6. Vocational Expert Testimony

During Plaintiff's hearing in front of the ALJ, the ALJ
also heard testimony from Marian Morocco, a Vocational Expert
("VE"). (R. at 80.) The ALJ asked the VE about work
opportunities for Plaintiff given the following parameters.

First, the ALJ asked the VE to take into account
Plaintiff's age, education, and past work; assume she had no
exertional limitations but cannot climb ropes, ladders or
scaffold; assume she cannot work around heights, and requires
low stress (work having no strict production quotas); and would
be off task 5% of the workday in addition to normal breaks. (R.
at 82.) Given these parameters, the ALJ asked if Plaintiff could
perform any of her past work. (R. at 82.) The VE answered in the
affirmative. (R. at 82.)

Next, the ALJ asked the VE to assume the same facts as
above, but to also limit Plaintiff to medium work. (R. at 83.)
The VE responded that, as defined in the DOT, Plaintiff could
perform past work, however, the CNA job that Plaintiff
previously had did require Plaintiff to perform some heavy
lifting so, as performed, it would not fit into the ALJ's
hypothetical. (R. at 83.) Then, the ALJ asked the VE to add to
the second hypothetical that the Plaintiff was limited to
routine tasks consistent with unskilled work. (R. at 83.) The VE
responded that the new parameter would rule out all past work.
(R. at 83) Next, the ALJ asked if, under these conditions, there
were any other jobs that Plaintiff could perform. (R. at 83.)
The VE responded that Plaintiff could be a kitchen helper, with
504,000 jobs in the national economy, a caretaker, with 877,000

jobs in the national economy, and a cleaner, with 426,000 jobs in the national economy. (R. at 83–84.)

The ALJ then reminded the VE that her hypo required Plaintiff to be off task 5% of the time, and asked what the maximum amount of time was that Plaintiff could be off task and still perform past work and the jobs the VE listed. (R. at 84.) The VE responded that generally 10% cumulatively is considered the max. (R. at 84)

Finally, the ALJ asked if Plaintiff was off task 15% of the work day she could perform any of the jobs mentioned. (R. at 84.) The VE responded that Plaintiff would be unable to perform any jobs in the national economy if she was off task 15% of the time. (R. at 84.)

Plaintiff's attorney then asked the VE several questions. First, the attorney asked about an employer's tolerance for an individual missing work for various health-related reasons in a given month. (R. at 85.) The VE responded that absences are generally not tolerated more than twice a month. (R. at 85.) Next, the attorney asked, given the ALJ's final hypothetical, which was for "medium work, routine tasks, consistent with unskilled work" and adding further that "the individual would have no ability to follow work rules, . . . relate to coworkers, use judgment with the public, to interact with supervisors, deal with work stresses, function independently or maintain attention

and concentration for two hour periods," if the individual would still be able to perform the jobs the VE cited. (R. at 85.) The VE responded that the jobs would be precluded. (R. at 85.) The attorney further inquired whether all employment would be precluded if just one of the elements the attorney added to the ALJ's hypothetical was present. (R. at 85.) The attorney explained that this question was based on the records of Plaintiff's treating physician. (Id. at 86.) The VE explained that the limitation of not being able to "use judgement with the public" would not preclude the employment the VE listed, but any one of the other limitations would preclude all work. (R. at 86–87.) Finally, Plaintiff's attorney asked if the "individual is also limited such that they can only occasionally demonstrate reliability due to irritability, panic attacks and mood swings," all work activity would be precluded. (R. at 87.) The VE responded that it would. (R. at 87.)

### C.   ALJ Decision

In a written decision dated July 26, 2016, ALJ Toland determined that Plaintiff was not disabled within the meaning of the Social Security Act from September 1, 2009, the alleged disability onset date, through July 29, 2016, the date of the ALJ's decision. (R. at 31-32.)

Using the five-step sequential evaluation process, the ALJ determined at step one that Plaintiff had not engaged in any

substantial gainful activity since September 1, 2009, the alleged onset date of disability. (R. at 22.)

At step two, the ALJ found that Plaintiff had severe impairments for major depressive disorder and anxiety related disorder. (R. at 22.) Notably, the ALJ determined that Plaintiff's physical impairments, including irritable bowel syndrome, headaches, hypertension, and obesity, were not severe. (R. at 22.)

Next, at step three, the ALJ found that Plaintiff's major depressive disorder and anxiety did not, alone or in combination, meet the severity of one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (R. at 23.) Specifically, in considering whether Plaintiff's impairments reached the severity level of a listed Affective Disorder, 12.04, or an Anxiety-Related Disorder, 12.06, the ALJ noted that the impairments did not meet the "paragraph B" criteria nor the "paragraph C" criteria. (R. at 23.) The ALJ explained that Plaintiff did not meet "paragraph B" because her mental conditions did not constitute a marked limitation (more than moderate but less than severe), nor had she experienced repeated episodes of decomposition (three episodes within one year). (R. at 23.) The ALJ supported these findings by relying on Plaintiff's ability to dress, bathe, and groom herself; take care of her grandchildren; and the reports of Drs. Brown and

Williamson that, at the consultative examinations, Plaintiff was

"cooperative and did not exhibit any inappropriate behavior,"

which "shows that she was capable of relating adequately with

strangers, without significant difficulties." (R. at 23.) The

ALJ further explained that Plaintiff did not meet "paragraph C"

because Plaintiff did not have a "documented history of chronic

affective disorder of a[t] least 2 years' duration that [had]

caused more than a minimal limitation of ability to do basic

work activities with symptoms or signs currently attenuated by

medication of [sic] psychosocial support." (R. at 23-24.) The

ALJ supported this finding by noting that the medical evidence

revealed no repeated episodes of decomposition and by citing the

psychiatric evidence in the record. (R at 24.)

Between steps three and four, the ALJ needed to determine

Plaintiff's Residual Functional Capacity ("RFC"). The ALJ found

that Plaintiff had the RFC to perform "medium work" except that:

> she can never climb ladders, ropes or scaffold; she cannot
> work around heights[;] . . . she would be limited to low-
> stress work involving only unskilled work and routine
> tasks; [and] . . . she would be off-task no more than 5% of
> the day in addition to regularly scheduled breaks.

(R. at 24.)

In determining Plaintiff's RFC, the ALJ "considered all

symptoms and the extent to which these symptoms can reasonably

be accepted as consistent with the objective evidence and other

evidence." (R. at 24.) The ALJ largely discounted the medical

opinions of Plaintiff's treating physician, Dr. Olga Kaczaj. (R.
at 26-27.) The ALJ also considered Dr. Brown's opinion that
Plaintiff had major depressive disorder and an anxiety disorder,
and a GAF between 50 and 55, which she gave "some weight, but
not great weight." (R. at 27-28.) The ALJ noted (but did not
weigh or analyze) Dr. Williamson's opinion, which was "similar
to that of Dr. Brown." (R. at 27.) Finally, the ALJ gave
"significant weight" to the opinions of the state agency medical
consultants who had reviewed the record at the request of the
Administration and stated that Plaintiff had no severe physical
impairments. (R. at 27.) According to the ALJ, the state agency
medical consultant opinions were "generally consistent with the
preponderance of the evidence." (R. at 27.)

Based on Plaintiff's RFC and testimony from a vocational
expert, the ALJ found, at step four, that Plaintiff was unable
to perform any past relevant work. (R. at 29.) At step five,
however, the ALJ found that there exists a significant number of
jobs in the national economy that Plaintiff can perform,
including kitchen helper (504,000 jobs), caretaker (877,000
jobs), and cleaner (426,000 jobs). (R. at 30-31.) Accordingly,
the ALJ found that Plaintiff was not disabled. (R. at 31.)

## III. STANDARD OF REVIEW

This Court reviews the Commissioner's decision pursuant to
42 U.S.C. § 405(g). The Court's review is deferential to the

Commissioner's decision, and the Court must uphold the
Commissioner's factual findings where they are supported by
"substantial evidence." 42 U.S.C. § 405(g); Fargnoli v.
Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Cunningham v. Comm'r
of Soc. Sec., 507 F. App'x 111, 114 (3d Cir. 2012). Substantial
evidence is defined as "more than a mere scintilla," meaning
"such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." Richardson v. Perales, 402
U.S. 389, 400 (1971); Hagans v. Comm'r of Soc. Sec., 694 F.3d
287, 292 (3d Cir. 2012) (using the same language as Richardson).
Therefore, if the ALJ's findings of fact are supported by
substantial evidence, the reviewing court is bound by those
findings, whether or not it would have made the same
determination. Fargnoli, 247 F.3d at 38. The Court may not weigh
the evidence or substitute its own conclusions for those of the
ALJ. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir.
2011). Remand is not required where it would not affect the
outcome of the case. Rutherford v. Barnhart, 399 F.3d 546, 553
(3d Cir. 2005).

**IV. DISCUSSION**

   **A.   Legal standard for determination of disability**

   In order to establish a disability for the purpose of
disability insurance benefits, a claimant must demonstrate a
"medically determinable basis for an impairment that prevents

him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." Plummer v. Apfel, 186 F.3d 422, 426 (3d Cir. 1999); 42 U.S.C. § 423(d)(1). A claimant lacks the ability to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Plummer, 186 F.3d at 427-428; 42 U.S.C. § 423(d)(2)(A).

The Commissioner reviews claims of disability in accordance with the sequential five-step process set forth in 20 C.F.R. § 404.1520. In step one, the Commissioner determines whether the claimant currently engages in "substantial gainful activity." 20 C.F.R. § 1520(b). Present engagement in substantial activity precludes an award of disability benefits. See Bowen v. Yuckert, 482 U.S. 137, 140 (1987). In step two, the claimant must demonstrate that the claimant suffers from a "severe impairment." 20 C.F.R. § 1520(c). Impairments lacking sufficient severity render the claimant ineligible for disability benefits. See Plummer, 186 F.3d at 428. Step three requires the Commissioner to compare medical evidence of the claimant's impairment to the list of impairments presumptively severe enough to preclude any gainful activity. 20 C.F.R. § 1520(d). If

a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Plummer, 186 F.3d at 428. Step four requires the ALJ to consider whether the claimant retains the ability to perform past relevant work. 20 C.F.R. § 1520(e). If the claimant's impairments render the claimant unable to return to the claimant's prior occupation, the ALJ will consider whether the claimant possesses the capability to perform other work existing in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. § 1520(g); 20 C.F.R. 404.1560(c).

**B.  Analysis**

Plaintiff argues that the ALJ erred by: (1) failing to properly weigh the medical evidence of record or explain medical evidence she dismissed, including the opinion of Plaintiff's treating physician, Dr. Kaczaj; (2) failing to take into account all of Plaintiff's medically determinable impairments; and (3) improperly discounting Plaintiff's testimony.

For the reasons explained below, the Court finds that the ALJ erred by failing to fully weigh and consider all of the medical evidence of record, including the medical opinions of Plaintiff's treating physician and Plaintiff's physical impairments. As such the Court cannot find that the Commissioner's finding is supported by substantial evidence, and

the Court will remand for resolution. <u>See</u> <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 42 (3d Cir. 2001) ("Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided.").

### 1. The ALJ failed to adequately explain the dismissal of Dr. Kaczyk's medical opinions

In reaching her conclusion that Plaintiff's mental limitations were not severe, the ALJ weighed the opinions of several medical professionals, including Plaintiff's treating physician. Plaintiff argues that the ALJ failed to adequately explain her dismissal of Dr. Kaczyk's medical opinions. The Court agrees.

The Court is mindful that "the ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." <u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 361 (3d Cir. 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c).) Furthermore, while an ALJ must consider the opinions of treating physicians, "[t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity" where it is not well supported or there is contradictory evidence. <u>Chandler</u>, 667 F.3d at 361 (alteration in original) (quoting <u>Brown v.</u>

Astrue, 649 F.3d 193, 197 n.2 (3d Cir. 2011)); see also Coleman
v. Comm'r. of Soc. Sec. Admin., 494 Fed. App'x 252, 254 (3d Cir.
2012) ("Where, as here, the opinion of treating physician
conflicts with that of a non-treating, non-examining physician,
the ALJ may choose whom to credit but cannot reject evidence for
no reason or for the wrong reason.") (quoting Morales v. Apfel,
225 F.3d 310, 317 (3d Cir. 2000)). On the other hand, treating
physicians' reports "should be accorded great weight, especially
'when their opinions reflect expert judgment based on a
continuing observation of the patient's condition over a
prolonged period of time.'" Plummer, 186 F.3d at 429.

Dr. Kaczyk was Plaintiff's treating physician for several
years. As described infra, Dr. Kaczyk repeatedly diagnosed
Plaintiff with severe depression and anxiety (R. at 562-65), and
ultimately opined that Plaintiff was "unable to maintain
employment" (R. at 521) and was "permanently disabled." (R. at
560.) Up front, the ALJ rejected Dr. Kaczaj's position that
Plaintiff was "disabled" because "the determination of
disability is reserved to the commissioner" and it is
"inconsistent with the balance of the evidence." (R. at 26.) The
ALJ then observed that, because Dr. Kaczaj is an internist, not
a psychiatrist, "his [sic] opinion on depression does not carry
as much weight as one from a psychiatrist would." (R. at 26.)
Ultimately, the ALJ concluded: "[Dr. Kaczaj's] opinion appears

to be a well-intentioned effort to help [Plaintiff] gain disability payments, but it is not persuasive." (R. at 26.)

Notably, the ALJ cited no medical evidence that directly contradicted Dr. Kaczyk's medical opinions. In fact, many of Dr. Kaczyk's medical opinions, notably her diagnoses that Plaintiff suffered from anxiety and depression, were supported by two state agency psychiatrists, Drs. Brown and Williamson. (R. at 432, 523.) As the Third Circuit has made clear, "[a]n ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence." Plummer, 186 F.3d at 429; see also Brewster v. Heckler, 786 F.2d 581, 584 (3d Cir. 1986) ("Although the regulations provide that a statement by a physician that a claimant is 'disabled' or 'unable to work' does not mean that the Secretary will determine that the claimant is disabled, the ALJ must nevertheless pay close attention to the medical findings of a treating physician.") (internal citations and quotation marks omitted). Thus, the ALJ erred. On remand, the ALJ must re-evaluate Dr. Kaczaj's medical opinions and, if the ALJ again determines that Dr. Kaczaj's medical opinions should be discounted or rejected, the ALJ must cite specific contradictory medical evidence that supports her decision for doing so.

2. The ALJ failed to properly take into account all of Plaintiff's medically determinable impairments

Plaintiff argues that the ALJ erred at step two by failing to explain how Plaintiff's irritable bowel syndrome, headaches, hypertension, and obesity failed to qualify as "severe." Plaintiff also argues that the ALJ erred between steps three and four by failing to adequately address these physical impairments in the formulation of the RFC. The Court will address each argument in turn.

a. The ALJ erred at step two

To find an impairment "not severe" at step two, the ALJ is instructed to provide "a careful evaluation of the medical findings that describes the impairment(s) (i.e., the objective medical evidence and any impairment-related symptoms), and an informed judgment about the limitations and restrictions the impairment(s) and related symptom(s) impose on the individual's physical and mental ability to do basic work activities." SSR 96-3p. "Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981) (internal citation omitted).

Here, the ALJ acknowledged Plaintiff's irritable bowel syndrome, headaches, hypertension, and obesity, but determined that these physical conditions did not severely impact Plaintiff because "they have no more than a minimal effect on her ability to do basic work activities, and cause no more than minimal functional limitations." (R. at 22.) The ALJ did not, however, provide any discussion about the severity of these impairments, nor did the ALJ cite any of the objective medical evidence in the record. On remand, the ALJ must carefully evaluate all of the evidence involving Plaintiff's physical impairments and explain why, alone or in combination, these impairments do or do not satisfy the step two severity standards.

  b.  The ALJ erred between steps three and four

Even if the ALJ had properly determined that Plaintiff's physical impairments were non-severe, a finding of non-severity does not eliminate Plaintiff's impairments from consideration of Plaintiff's overall ability to perform past work. Indeed, between steps three and four, the ALJ is required to assess all of Plaintiff's impairments - even ones that are not "severe" - in combination when making the RFC determination. See 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we

assess your residual functional capacity."). SSR 96–8p is clear about what the ALJ must consider:

> In assessing RFC, the adjudicator <u>must</u> consider limitations and restrictions imposed by <u>all</u> of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

SSR 96–8p (emphasis added); <u>see also</u> <u>Soboleski v. Comm'r of Soc. Sec.</u>, No. 14–3156, 2015 WL 6175904, at *2 (D.N.J. Oct. 20, 2015) (explaining that a finding of non-severity "does not obviate the need for a separate analysis of how Plaintiff's impairment affects her RFC"). The ALJ must therefore consider all relevant evidence when determining an individual's RFC. <u>See</u>, <u>e.g.</u>, <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 41 (3d Cir. 2001).

The Court finds that a remand is required on this issue because the ALJ failed to address Plaintiff's non-severe impairments (irritable bowel syndrome,[3] headaches, hypertension, and obesity[4]) in the RFC analysis. The effect of Plaintiff's

---

[3] Of note, the ALJ never even mentioned Plaintiff's testimony about her irritable bowel syndrome, which apparently required her to visit the bathroom several times per hour. (R. at 70-71.)
[4] The ALJ briefly noted Dr. Kaczaj's evaluation of Plaintiff's hypertension and obesity (R. at 26-27), but did not analyze how these impairments affected Plaintiff's RFC.

physical impairments, even if they were properly determined to be "not severe" by the ALJ, merits discussion in the RFC analysis in accordance with SSR 96-8p, <u>supra</u>. Accordingly, the RFC finding is incomplete and not supported by substantial evidence.

### C. Credibility findings on Plaintiff's testimony

The Court is remanding for the above reasons and will not address Plaintiff's remaining argument that the ALJ erred in her determination of credibility by failing to give sufficient reasons for rejecting Plaintiff's testimony. Specifically, Plaintiff claims the ALJ erred by improperly discounting Plaintiff's testimony on the basis that "Plaintiff is independent in bathing and grooming and helps take care of 4 children, the youngest 2 years old, while her daughter works." (Pl. Br. at 22) (citing R. at 28.) Plaintiff further argues "it was improper for the ALJ to discount the Plaintiff's statements [based on the fact that Plaintiff had not had period of ongoing psychiatric treatment] without considering the reasons for the gaps in treatment and the [supporting] evidence." (Pl. Br. at 23) (citing R. at 29.)

The Court merely points out that, in considering the above issues on remand, the ALJ will be free to weigh the claimant's credibility anew. Pursuant to SSR 96-7p, the ALJ "must consider the entire case record and give specific reasons for the weight

given to the individual's statements." SSR 96-7p also "mandates that the [credibility] 'determination . . . must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to . . . any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." <u>Williams v. Barnhart</u>, 211 Fed. App'x 101, 105 (3d Cir. 2006) (quoting SSR 96-7p).[5] However, inconsistencies in a claimant's testimony or daily activities permit an ALJ to conclude that some or all of the claimant's testimony about her limitations or symptoms is less than fully credible. <u>See</u> <u>Burns v. Barnhart</u>, 312 F.3d 113, 129-30 (3d Cir. 2002).

Here, the ALJ listed several reasons for discrediting Plaintiff's testimony, including: (1) "[c]linical findings and objective diagnostic studies did not support [her] testimony;" (2) Plaintiff "is independent in dressing, bathing and grooming" and "helps take care of 4 children, the youngest 2 years old,

---

[5] SSR 96-7p also provides that the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." The ALJ should also give weight to factors such as the medical reports, a plaintiff's daily activities, duration and intensity of symptoms, and treatments that have been used to relieve symptoms. 20 C.F.R § 404.1529(c).

while her daughter works;" (3) medications appeared to mitigate the effects of Plaintiff's symptoms; (4) Plaintiff's claim that she "sees shadows at night" is "vague and not compelling, and does not appear to indicate true psychosis;" (5) her alleged onset date does not coincide with an onset or exacerbation of depression and anxiety; (6) the reason she stopped working in daycare is not associated with an onset or exacerbation of depression and anxiety; (7) Plaintiff had never been in ongoing psychological care; and (8) "there is insufficient evidence to establish that her symptoms reduced her occupational base to less than sedentary work." (R. at 28-29.) This issue cannot be examined in the absence of amplified findings on remand regarding the above determinations.

## V. CONCLUSION

For all of these reasons, the Court finds that the case should be remanded to ensure that the ALJ properly weighs the medical opinions of Plaintiff's treating physician and accounts for all of Plaintiff's medically determinable physical impairments, as appropriate. An accompanying Order will be entered.


**December 19, 2017**                          **s/ Jerome B. Simandle**
Date                                           JEROME B. SIMANDLE
                                               U.S. District Judge